UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

United States of America,                          Case No. 18-cr-194 (ADM/DTS)

      Plaintiff,

v.                                                                 **REPORT AND RECOMMENDATION**

Kenneth Davon Lewis,

      Defendant.

_____

Thomas Calhoun-Lopez, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, for the Government

Kevin C. Riach, Fredrikson & Byron, P.A., 200 South Sixth Street, Suite 4000, Minneapolis, Minnesota 55402, for Defendant

_____

      Defendant Kenneth Davon Lewis was indicted for being an Armed Career Criminal in Possession of a Firearm in violation of 18 U.S.C. §§ 922(g), 924(e). Lewis moves to dismiss the indictment due to outrageous government conduct or, alternatively, to suppress the testimony of the detective who violated Lewis's Sixth Amendment right to privileged communications with his attorney. For the reasons discussed below, the Court recommends denying the motion to dismiss the indictment but granting the motion to suppress the detective's testimony and enjoin her from further participation in this case. The Court also recommends additional limitations on the Government's presentation of its case against Lewis to remedy the constitutional violations.

**FINDINGS OF FACT**

Lewis was arrested by Coon Rapids Police Officers on April 18, 2018, allegedly after they found him with a firearm and methamphetamine. Gov't Mem. of Law at 1, Docket No. 74.[1] On April 19, 2018 he was interviewed by Anoka County Sheriff's Office (ACSO) Detective Tessa Villegas and Coon Rapids Police Detective Autumn Nelson at the Anoka County Jail where he was being held. R&R (Dec. 7, 2018) at 2, Docket No. 36. Det. Villegas was the lead county detective on his case. Tr. 49, 57, 75.[2] On April 20, 2018 Lewis was charged in state court with first degree assault against a police officer, possession of a firearm, and possession of methamphetamine. Gov't Mem. of Law at 2, Docket No. 74. A state public defender, Brad Zunker, was appointed to represent him. *Id.*

On August 15, 2018 Lewis was indicted on a federal charge of being a felon in possession of a firearm. Docket No. 1. His current attorney, Kevin Riach, was appointed to represent him with respect to the federal charge on August 17, 2018. Docket No. 7.

## I.    Lewis's Letter to His Public Defender

The Anoka County Jail Inmate Handbook (June 27, 2018)[3] sets forth the following policies on incoming and outgoing mail:

> INCOMING MAIL
>
> All incoming mail will be opened and inspected for contraband and inappropriate material. **Only correspondence with attorneys**, officers of the court, elected officials, and the officials of the Department of Corrections **will be opened in your presence**. . . .
>
> * * *

---

[1] For the most part, records relating to the state court charges are not part of the record in this case.

[2] The transcript citations are from the September 11, 2019 hearing, *see* Docket No. 88.

[3] The mail policies in the March 11, 2019 version of the handbook were used as an exhibit at the September 11, 2019 evidentiary hearing (Ex. DS-1), but the text is the same.

OUTGOING MAIL

All outgoing mail will be opened and inspected for contraband. DO NOT SEAL THE ENVELOPES OF OUTGOING MAIL. **Letters to** elected officials, officers of the Department of Corrections, **attorneys**, or other officers of the court will not be read or censored. Housing deputies will accept outgoing mail during non-lockdown hours. All outgoing mail must contain the following return address information or we will return it to you.

Your full name
Anoka County Jail
325 East Jackson Street
Anoka, MN 55303-2210

**We will not accept mail that has any additional writing or pictures on the outside of the envelope.**

Handbook at 9, Docket No. 71-1 (emphasis added).

Lewis sent a letter dated February 7, 2019 to Zunker, his state public defender. It was addressed to Zunker but did not state a law firm name or any notation indicating that he is an attorney.[4] However, as lead detective on Lewis's case, Det. Villegas knew from "court hearings and monitoring jail phone calls [that] the Public Defender assigned to Mr. Lewis was Mr. Bradley Zunker." Villegas Decl. ¶ 5, Docket No. 74-1.

Lt. Sheila Larson is the administrative lieutenant in ACSO's jail division and has been a supervisor at the jail for over 20 years. Tr. 4. One of her duties is to collect an inmate's incoming and outgoing mail if requested by a detective. Tr. 13-14. The mail is scanned and emailed to her directly from the scanner, then she forwards it to the detective. Tr. 14. She does not print paper copies of the scanned materials. Tr. 14. Lt. Larson does not screen the scanned mail for privileged content, but sometimes scrolls

---

[4] Lewis provided a copy of the letter and envelope to the Court for *in camera* review.

through it to see whether it is a good quality scan and pages are not upside down or twisted. Tr. 15.

Det. Villegas has over 12 years of law enforcement experience. During the time period relevant to this motion, she was a detective in the ACSO Criminal Investigation Division (CID). Villegas Decl. ¶ 1.  She has been a detective for six and a half years and, before that, was a patrol officer for over six years for the City of Columbia Heights. Tr. 48-49. As lead detective in Lewis's case, she was responsible for handling requests from attorneys, search warrants, additional interviews, and talking to witnesses. Tr. 49-50.

In August 2018 she asked Lt. Larson to collect Lewis's incoming and outgoing mail and forward it to her. Tr. 16-17, 52. Det. Villegas did not ask jail staff to screen it for privileged material. Tr. 60. Lt. Larson did not forward Lewis's mail to anyone other than Det. Villegas. Tr. 16-17. Although Lt. Larson testified that she did not read any of Lewis's mail before forwarding it, she also said she "may have" discussed the contents of his mail with Det. Villegas, though she cannot recall whether she did so. Tr. 17. Det. Villegas testified that she saved pieces of Lewis's mail in her electronic case file if she thought it was relevant to the case, but deleted the rest. Tr. 59.

In addition to collecting his mail, Det. Villegas regularly listened to his jail phone calls, and at one point was listening to every single call. Villegas Decl. ¶ 3; Tr. 58-60. She also watched 10 or 12 of his visitation videos. Tr. 61. She testified that she never watched any video visits of Lewis and his attorney and never watched or listened live to a visit between Lewis and his attorney. Tr. 61-62.

On February 8, 2019 Lt. Larson sent an email to Det. Villegas attaching several pieces of Lewis's mail, including his February 7 letter to public defender Zunker. Docket

No. 71-2. Lt. Larson did not read the letter and did not know she had forwarded privileged mail to Det. Villegas until Assistant U.S. Attorney (AUSA) Calhoun-Lopez contacted her in late May 2019. Tr. 17, 36. Lt. Larson also testified she did not forward Lewis's mail to anyone else and has never read the February 7 letter. Tr. 16-17, 36.

Det. Villegas read Lewis's December 7 letter and forwarded it to AUSA Calhoun-Lopez on February 11, 2019. Tr. 66-67. The email subject line was "Lewis Mail" and she wrote the following message:

> Just some mail to Lewis' County PD if you're interested.
>
> I am also hearing some VERY vague references to what could be the gun and where it came from in Lewis' calls to his gf – it's very hard to discern between the slang and other language, so I am not sure it would be of any valuable[sic].

Docket No. 71-2. "PD" stands for Public Defender. Villegas Decl. ¶ 4; Tr. 66-67.

When Det. Villegas sent the email to AUSA Calhoun-Lopez, she "knew that the letter . . . contained privileged communications with Mr. Zunker." Tr. 66. She "knowingly and intentionally" violated Lewis's rights by reading the letter and forwarding it to the federal prosecutor. Tr. 64-65. But she also minimized her actions as a "technical" violation and a "mistake with no ill intent." Tr. 64. She also offered the bizarre justification that she "had heard conversations via jail phone calls that Mr. Lewis . . . either fired or was planning on firing Mr. Zunker," so her "train of thought" was that "[i]f he fired Mr. Zunker, then he wouldn't be his attorney anymore, therefore it wouldn't be privileged." Tr. 66. She testified she did not know a defendant could not "fire" a public defender without the involvement of the court that appointed him. Tr. 84.

AUSA Calhoun-Lopez did not notice the email from Det. Villegas until late May when he was reviewing materials to disclose to Lewis. *See* Docket No. 71-6 (May 30,

2019 Letter to attorney Riach). On May 23, 2019, he emailed Det. Villegas to ask whether "PD" in her February 11 email meant "public defender," and if it did he was not going to open the attachment because it included privileged information. Villegas Decl. ¶ 4. He directed Det. Villegas to delete all copies of the letter. Letter at 2, Docket No. 71-6. He stated that he did not open the attached letter and that neither he nor Special Agent[5] David Carriker read it. *Id.* Det. Villegas said she did not forward the letter to anyone other than AUSA Calhoun-Lopez, she deleted the email attachment at his request, and there is no paper copy of it. Villegas Decl. ¶ 6; Tr. 67, 74, 81.

On May 30, 2019 AUSA Calhoun-Lopez emailed a letter to attorney Riach in which he disclosed the violation, explained what happened, said he would have IT forward the email attachment containing the privileged letter, and conveyed Lt. Larson's assurances that jail staff would redouble their efforts to prevent future violations of attorney-client privilege. Docket No. 71-6.

Det. Villegas claims she did not discuss the contents of the February 7 letter "with any member of the prosecution team," specifically including AUSA Calhoun-Lopez and Agent Carriker. Villegas Decl. ¶ 6. She does not identify who exactly she considers to be part of the "prosecution team" and whether it includes people involved in the state court charges and proceedings, or only the federal prosecution team in this case, or other people involved in Lewis's case. Notably missing from her written declaration and her oral testimony is any statement that she never *at any time* discussed the contents of the letter with *anyone.* By the time of her July 9, 2019 Declaration and her September 11, 2019 testimony, she asserted that she did not recall what the February 7 letter said "[d]ue to

---

[5] Special Agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives.

the passage of time, and number of mailings [she] ha[s] read to and from Mr. Lewis." *Id.* ¶¶ 4, 6; Tr. 77. But this does not account for the time period immediately after she read the letter, when it was fresh in her mind, when she specifically called it to the federal prosecutor's attention in her email, and when she was actively reading Lewis's mail, listening to his phone calls, watching his video visitations, and engaging in other activities described below.

## II.    Recorded Phone Calls Between Lewis and His Attorney

All inmate phone calls except attorney phone calls are recorded by the jail. Tr. 10. To determine whether it is an attorney phone call, the jail gets the phone number, typically from the inmate, and enters it into the phone system. Tr. 11-12.[6] The system then automatically blocks the attorney's phone number so that the call is not recorded. Tr. 11-12, 62. If an attorney uses a different number that is not in the system, such as a cell phone number, the call will be recorded. Tr. 12, 62. The recorded calls are stored electronically, and ACSO detectives can listen to them from their desks. Tr. 12.

Det. Villegas testified that she had never listened to a conversation between Lewis and any of his attorneys. Tr. 62. Her practice was that, if she was listening to a recorded call and realized it was with an attorney, she "immediately stop[ped] listening" and contacted jail staff to add the phone number to the blocked list so that future calls would not be recorded. Tr. 62. She testified that this happened on one occasion with a call

---

[6] The jail inmate handbook states that the main phone numbers of "public defenders offices, and numerous legal assistance agencies have been programmed into our telephone system as toll-free calls. These calls are not collect and are not subject to monitoring and recording. If you have a private attorney, fill out a kite with the name and telephone number of your attorney. After we have verified the information and entered the number into our system, you will be able to place a toll free, non-recorded call to your private attorney." Anoka County Jail Inmate Handbook at 13, Docket No. 71-1.

between Lewis and his attorney in early 2019. Tr. 62. She did not know whether the voice she heard was public defender Zunker or attorney Riach. Tr. 62. She testified that she only listened to the call for the brief time it took her to realize it was a call with an attorney, then she contacted a jail sergeant to add that phone number to the blocked list. Tr. 62-63; 87-88. She said this was the only phone call between Lewis and an attorney that she listened to. Tr. 88. She testified she knows it is wrong to listen to an inmate's conversations with his attorney. Tr. 63.

But call logs produced by the Government post-hearing showed that Det. Villegas listened to parts of Lewis's recorded phone calls with attorney Riach that occurred on November 12 and 16, 2018, April 24, 2019, and May 2, 2019, and that she downloaded two recorded calls with attorney Riach that occurred on March 28 and April 5, 2019. *See* Docket Nos. 96-1, 103-1.[7] These calls were made to counsel's direct phone number at his law firm. *Id.*[8] Det. Villegas downloaded or listened to portions of the six recorded calls either the same day of the call or no later than three days after the call. *Id.* With respect to the two downloaded recordings, the call logs show the dates of the recorded calls and the dates Det. Villegas downloaded them but there is no way to determine from these records whether, when, or how much of the recordings she listened to. Clearly then, contrary to her testimony, she did not listen to only one attorney call, nor did she have the

---

[7] Docket No. 103-1 is the "Expanded Report of All Recorded Calls from 08-17-2018 thru 10-06-2019 from the Anoka County Jail to [attorney Riach's phone number]" and shows six calls. Docket No. 96-1 is a similar call log but for a narrower time period, which shows only four of the six calls.

[8] The phone number listed on the call logs is the number listed for attorney Riach on his law firm's website, www.fredlaw.com (last visited Dec. 10, 2019).

phone number blocked from automatic recording by the jail phone system. Det. Villegas's testimony is more than an evasion, it is a lie.

### III.    Other Incidents Involving Det. Villegas

In addition to the letter to public defender Zunker, Det. Villegas received a copy of correspondence to Lewis from Legal Assistance to Minnesota Prisoners. Tr. 60-61. She testified that "[a]t the time [she] didn't recognize it as legal mail." Tr. 60-61. She knew Lewis has written to several different agencies and was "not 100 percent sure what each agency does." Tr. 61. This letter is not part of the record in this case, nor has anyone discussed its contents.

Along with reading Lewis's mail, listening to his phone calls, and watching videos of his meetings with visitors, Det. Villegas interfered in his personal life, particularly with respect to a girlfriend, AA, who had testified before the grand jury.[9]

Det. Villegas took a copy of a letter between Lewis and a girlfriend, EG, which she had received as part of his forwarded mail from the jail, and delivered it to the front desk of a hotel where AA was staying. Tr. 67. Det. Villegas did not leave any note for AA with the letter, nor did she call or otherwise alert AA that she was dropping off a letter. Tr. 68. She knew that AA had testified before a federal grand jury on August 13, 2018, yet said she "wouldn't consider [AA] a witness." Tr. 70. When she brought the letter to the hotel, she knew AA was pregnant with Lewis's child. Tr. 79-80. She told AUSA Calhoun-Lopez she wanted AA to see the letter because she thought AA was being "exploited, manipulated and abused and hoped that [AA] would see that she should not tolerate it."

---

[9] Most of the 10 or 12 video visits she watched were between Lewis and AA. Tr. 61.

Tr. 68. She "never considered" that her interference with AA and Lewis might impact AA's willingness to assist Lewis in this case. Tr. 70-71. Though she did not think it was "wrong" to deliver a copy of the letter to the hotel for AA, she conceded it would be "frowned upon" by Lewis and his attorney. Tr. 69-70.

Det. Villegas also used the email account of a former girlfriend of Lewis's, LH, to send an email to AA. Tr. 71. She knew about LH from reading Lewis's mail and listening to his phone calls with her. Tr. 71. Det. Villegas testified that she "didn't remember, but probably" impersonated LH in the email to AA saying that she was getting back together with Lewis. Tr. 71. She knew that doing this was wrong. Tr. 72. Det. Villegas did not preserve a copy of this fake email she sent to AA. Tr. 75.

Det. Villegas also posed as a friend of LH's on Facebook and communicated with AA. Tr. 86-87. She testified there were no other instances in which she impersonated others to communicate with anyone in this case. Tr. 75, 87.

Det. Villegas admitted her efforts to influence AA throughout this case, stating that "[f]rom the beginning " she "just wanted [AA] aware of the totality of what is going on with Mr. Lewis." Tr. 72.

## IV.   Det. Villegas's Communications With Other Case Participants

As the county's lead detective on Lewis's case, Det. Villegas regularly communicated with people connected to the case.

She did not recall any conversations with police officers involved in the case. Tr. 50. She took DNA swabs from some officers, but another detective took their formal statements. Tr. 50. Any substantive conversation directly related to the case would probably be documented in her case file, which has been preserved at ACSO. Tr. 50.

She communicated with Lt. Larson several times about the collection of Lewis's mail. Tr. 52. Since June 1, 2019 she talked to Lt. Larson 5 to 10 times, mainly by phone. Tr. 52-53. During that time period Lt. Larson sent her about 50 emails, most of which transmitted Lewis's mail and about 5 of which related to other topics that Det. Villegas did not recall. Tr. 54. She could not recall the last email she sent to Lt. Larson. Tr. 54. Those emails are deleted but the attachments are saved. Tr. 55.

Det. Villegas regularly deleted emails when she no longer needed the information. In addition, Anoka County's system does not retain emails longer than 90 days, and it is her understanding that deleted emails are not recoverable from the system after 90 days. Tr. 55-56.

Since June 1, 2019 Det. Villegas has exchanged 3 to 5 emails with Det. Nelson of the Coon Rapids Police Department about updates in Lewis's case. Tr. 56-57. She recalls asking her "how things were going since it's taking a while." Tr. 51. She has had no communications with Officer Moriarty during this time period, and the last time she talked to him was the day she took his statement. Tr. 58. She also had no substantive conversations with Officer Sharon. Tr. 58.

She communicated with ATFE Special Agent Carriker, the federal case agent, by email but not by phone, and met him for the first time the day of the September 11, 2019 hearing. Tr. 75-76, 78. Since February 1, 2019 she has had 25-30 email conversations with him, with 5 or 10 of them between May and September 2019. Tr. 78. During the same time period she has exchanged 30 emails with AUSA Calhoun-Lopez, with 10 or 15 of them between May and September 2019. Tr. 79.

Det. Villegas testified that she never texted Lt. Larson or other law enforcement personnel regarding Lewis's case. Tr. 80-81.

Any hard copy documents Det. Villegas collected for Lewis's case are preserved in the case file. Tr. 73. She has not destroyed any documents related to the handling of Lewis's privileged mail. Tr. 74.

## V.   Other Incidents Involving Lewis's Legal Mail at Anoka County Jail

Other incidents involving Lewis's legal mail occurred both before and after AUSA Calhoun-Lopez spoke with Det. Villegas and Lt. Larson in late May 2019 about the violation involving Lewis's February 7, 2019 letter to public defender Zunker.

Sometime in February or early March 2019[10] Lewis sent a letter to the state law library requesting certain materials. On March 10, 2019 Lewis asked jail staff why he had never received a response from the law library. *See* Inmate Request Form, Docket No. 71-3. After confirming Lewis had the correct address, Sgt. Wood contacted the law library and reported back to Lewis that the library said it never received his letter. Docket No. 71-4. But this letter and envelope apparently were scanned and sent to Det. Villegas because copies exist and were provided to the Court by attorney Riach. The letter to the state law library is not mentioned in Det. Villegas's Declaration [Docket No. 74-1] or in AUSA Calhoun-Lopez's letter to Riach [Docket No. 71-6], nor was Det. Villegas specifically asked about it at the September 11 hearing.

After the AUSA talked to Lt. Larson in late May 2019, she told him jail staff would "redouble efforts" to protect Lewis's attorney-client privileged mail. Tr. 17-18. She talked

---

[10] Lewis provided a copy of this letter and envelope to the Court for *in camera* review, and the letter does not have a date.

to the eight sergeants at the jail and to individual detention staff and "quizz[ed]" people about attorney-client privilege and mail handling at the jail. Tr. 18. She was "confident" that jail staff understood attorney-client privilege and legal mail. Tr. 18. She said staff "will seal a letter to an attorney from an inmate, and . . . will open a letter from an attorney in front of an inmate. . . . [T]hat mail is not opened unless – or closed unless it's in the presence of an inmate." Tr. 18. Nonetheless, additional incidents occurred.

For example, on June 25, 2019 Lt. Larson responded to Lewis's written grievance that a piece of incoming legal mail from Judicare of Anoka County was delivered to him already opened and that a staff member told him she did not know this was legal mail. *See* June 19, 2019 Grievance, Ex. DS-8. Lt. Larson approved his grievance but excused the jail's lapse by saying she and other staff did not know it was legal mail. She  wrote that "[i]f the letter was not marked Attorney/Client Privilege, we would not have known" it was legal mail. *Id.* To Lewis's point that Judicare of Anoka County is listed on a "Legal Resources sheet printed 11/30/18 . . . obtained from the jail library," Lt. Larson responded that she was not familiar with Judicare, apologized, thanked Lewis "for letting us know about it and to be more cognizant in the future." *Id.* This incident occurred about three weeks after her assurances of "redoubled efforts" and "quizzing" staff on attorney-client privilege and mail handling.

On July 8, 2019 Lewis again reported incoming legal mail, this time from Legal Assistance to Minnesota Prisoners, that he received already opened. *See* Grievance Form, Ex. DS-2. Sgt. Carrie Wood responded by telling him the "documents were not sent by an officer of the courts so this is not considered privile[]ged mail." *Id.*

13

As late as September 2019, when Lt. Larson testified at the hearing, she did not seem to know the language in the inmate handbook regarding incoming and outgoing mail, whether it matched the jail's practices, or whether jail staff have received any training on how to determine what is legal mail. For example, she testified that the process for outgoing legal mail is that the inmate either writes "legal mail" on the envelope or tells the deputy it is legal mail, then the letter is sealed in front of the deputy and is put in outgoing mail. Tr. 9-10. The handbook does not, however, provide any specific instructions to inmates about how to handle outgoing legal mail, does not tell them to write "legal mail" on the envelope, and in fact specifically warns them not to write anything else on the envelope for outgoing mail other than the approved return address (and, presumably, the name and address of the intended recipient). *See* Handbook at 9 ("We will not accept mail that has any additional writing or pictures on the outside of the envelope."), Docket No. 71-1.

With respect to incoming mail, Lt. Larson testified that the process for determining whether it is legal mail is left up to two jail employees ("jail inmate programmers") who are responsible for going through the mail each day. Tr. 9. She had no idea whether they had ever received any training to recognize legal mail. Tr. 9. Rather, she assumed that, because they "both have worked there for over 20 years, . . . I think just based on their experience, they do a good job." Tr. 9.[11] Lt. Larson testified that the "process" for determining whether incoming mail is legal or not is that it is "typically marked legal mail"

---

[11] Q: And how are they trained to determine what constitutes legal mail?

A: I suppose just from experience. I can't say that they have ever been to a training on what is acceptable in determining if something is considered legal mail or not. I can't tell you if they have done that or not. They both have worked there for over 20 years, and so I think just based on their experience, they do a good job." Tr. 9.

Tr. 8. She was not aware of the jail's law library having any list of legal assistance organizations or a legal resource sheet to help staff determine whether an incoming letter was "legal mail" and testified that they could "go online to look up different agencies or firms." Tr. 8.

## VI.    Procedural History

After Lewis's counsel received AUSA Calhoun-Lopez's letter regarding Det. Villegas's misconduct in reading Lewis's attorney-client privileged mail and forwarding it to the federal prosecutor, Lewis filed this motion to dismiss the indictment or, alternatively, to suppress Det. Villegas's testimony. Docket No. 71. Lewis also brought a motion for discovery regarding the scope of her misconduct and to determine whether other violations had occurred with respect to his privileged phone calls and letters. Docket No. 72.[12]

By the time of the evidentiary hearing on September 11, 2019, Lewis had learned of additional misconduct by Det. Villegas. The Government produced discovery, then Lewis filed a supplemental brief on October 4, 2019 to which the Government responded on October 18, 2019. Docket Nos. 96, 100. After the Government produced additional discovery to Lewis, each party filed a second supplemental brief on November 4 and 14, respectively. Docket Nos. 103, 106.

Det. Villegas was still the lead detective as of the September 11, 2019 hearing on this motion. Tr. 57. A month later the Government stated that she was "no longer involved in any way with this case, and will have no contact regarding the case with any state or federal investigator involved in Lewis's case or detention." Gov't Suppl. Mem. of Law at

---

[12] The parties resolved the discovery motion by mutual agreement. *See* Docket No. 101.

3, Docket No. 100. It also said that Lewis had been moved to Sherburne County Jail, in coordination with Lewis's attorney. *Id.* In its second supplemental brief the Government stated that the Anoka County Attorney's Office confirmed that, as of November 11, 2019, Det. Villegas was no longer employed by ACSO. Gov't Second Suppl. Mem. of Law at 1, Docket No. 106.[13]

Lewis seeks to dismiss the indictment against him or, alternatively, to suppress the testimony of Det. Villegas and enjoin her from further participation in the prosecution because she violated his Fifth Amendment right to due process and Sixth Amendment right to counsel by knowingly and intentionally reading his privileged letter, forwarding it to the federal prosecutor, and listening to portions of several of his phone calls with his attorney. Lewis contends that no showing of prejudice is required when there has been "gross misconduct" by the Government; that it is "gross misconduct" if the constitutional violation was done in bad faith; and there is ample evidence that Det. Villegas acted in bad faith, including the fact that she lied during the evidentiary hearing. *See* Lewis Second Suppl. Mem. of Law at 2, Docket No. 103 (citing *United States v. Singer*, 785 F.2d 228, 234 n.6 (8th Cir. 1986)).

Even if prejudice is required, Lewis asserts that the prejudice here is clear and pervasive because Det. Villegas communicated with law enforcement, the prosecution, and witnesses after obtaining the privileged information, and there is no way for the Court or a jury to know whether any information she shared or any case strategy she suggested was the product of lawful investigation or her knowledge of privileged information.

---

[13] These representations are made in the Government's brief. There is no evidence in the record that attests to Det. Villegas's current employment status or involvement with any aspect of the state or federal charges against Lewis.

The Government agrees that Det. Villegas engaged in serious misconduct but contends that her violations have not prejudiced Lewis nor created a substantial threat of prejudice, and thus dismissal of the indictment is not appropriate under Supreme Court and Eighth Circuit precedent.

Instead, the Government argues that the appropriate remedy is to enjoin Det. Villegas's participation in the case, and it proposes to further limit its fact witnesses at trial to persons who were present at the scene when Lewis allegedly possessed the firearm, along with witnesses to establish DNA evidence (if ruled admissible pursuant to a separate motion), interstate nexus, and felony status as charged in the indictment. *See* Gov't Suppl. Mem. of Law at 5-6 and Second Suppl. Mem. of Law at 2, Docket Nos. 100, 106. The Government says it does not intend to call AA as a witness. Gov't Suppl. Mem. of Law at 5, Docket No. 100.

## CONCLUSIONS OF LAW

The Sixth Amendment provides that an accused has the right to the assistance of counsel for his defense. *United States v. Morrison,* 449 U.S. 361, 364 (1981). This right is fundamental to our system of justice and is meant to assure fairness in the adversary criminal process. *Id.* It is clear that the Constitution does not permit the Government to read or listen to communications between an accused and his attorney.

Outrageous government conduct requires dismissal of an indictment "only if it falls within the narrow band of the most intolerable government conduct." *United States v. Bugh*, 701 F.3d 888, 894 (8th Cir. 2012) (quoting *United States v. Morse*, 613 F.3d 787, 792-93 (8th Cir. 2010)). "Law enforcement agents' conduct is so outrageous that due process principles bar the Government from using the judicial process to obtain a

17

conviction only when agents' conduct violates 'that fundamental fairness, shocking the universal sense of justice, mandated by the Due Process Clause of the Fifth Amendment.'" *Id.* (quoting *United States v. Russell*, 411 U.S. 423, 432 (1973)); *see also Smith v. Groose*, 205 F.3d 1045 (8th Cir. 2000) (granting habeas relief for due process violation where prosecutor used factually inconsistent theories to obtain murder convictions in separate trials against two different people for the same murders) (cited in *Morse*, 613 F.3d at 793). The rule that outrageous government conduct can foreclose criminal charges has been applied by the Eighth Circuit "almost exclusively to situations involving entrapment, where law enforcement officers have sought to create crimes in order to lure a defendant into illegal activity." *United States v. Boone*, 437 F.3d 829, 842 (8th Cir. 2006).

The Eighth Circuit stated in *United States v. Williams* that it had not had occasion to opine on governmental intrusion into an attorney-client relationship in the context of the Due Process Clause of the Fifth Amendment. 720 F.3d 674, 685 (8th Cir. 2013). It noted other circuits' adoption of the Third Circuit's three-prong test for determining whether there is a colorable claim of outrageousness regarding governmental intrusion into the attorney-client relationship. That test requires the defendant to establish (1) the government's objective awareness of an attorney-client relationship, (2) deliberate intrusion into that relationship, and (3) actual and substantial prejudice. *Id.* at 686 (citing *United States v. Voigt,* 89 F.3d 1050, 1067 (3d. Cir. 1996)). But the Court in *Williams* found that it "need not proceed to analyze [the] claim under the *Voigt* test, as that test is wholly premised on an attorney-client relationship existing in the first instance," and the Court found no such relationship under the facts in *Williams. Id.* at 687.

18

Lewis relies on a footnote in the Eighth Circuit's *Singer* case to assert that an indictment may be dismissed without a showing of prejudice if the Government engaged in bad-faith "gross misconduct." But he reads too much into what the *Singer* Court itself characterized as a "comment" made in another footnote in a different case: "Singer urges that we apply the standard set out in *United States v. Davis*, 646 F.2d at 1303 n.8, where we commented, 'It is certainly true that where there is gross misconduct on the part of the government no prejudice need be shown.'" *Singer*, 785 F.2d at 234 n.6. The Court did not discuss it further, noting that "Singer's application of *Davis* really is beside the point" under the facts of the case. *Id.* And the Court did not conclude that dismissal of the indictment was the proper remedy for the Government's intrusion into the attorney-client privilege. Rather, it upheld the district court's "carefully shaped remedial order . . . under the standard set out by the Supreme Court in *United States v. Morrison* . . . to restore Singer's sixth amendment protections." *Id.* at 236-37.[14]

In *Morrison* the Supreme Court reversed the dismissal of an indictment that the lower court had granted based on an alleged Sixth Amendment violation. 449 U.S. at 364. The Court stated:

---

[14] Two federal cases that dismissed indictments due to outrageous governmental intrusion into the attorney-client relationship are factually distinguishable from this case. In *United States v. Schell*, 775 F.2d 559 (4th Cir. 1985), a prosecutor participated in the prosecution of two former clients. The Fourth Circuit held that dismissal of the indictments was warranted because "due process is violated when an attorney represents a client and then participates in the prosecution of that client with respect to the same matter." *Id.* at 566. In *United States v. Marshank*, 777 F. Supp. 1507 (N.D. Cal. 1991) a defense attorney worked with law enforcement agents and prosecutors to build a case against his own client. The district court concluded the "fruit of the prosecutor's transgression [wa]s the indictment itself" and it was "simply impossible to excise the taint" caused by the violation of the defendant's Fifth and Sixth Amendment rights other than by dismissing the indictment. *Id.* at 1522. "The taint of the government's transgressions spreads to all the evidence obtained against [him]." *Id.*

> [W]ithout detracting from the fundamental importance of the right to counsel in criminal cases, we have implicitly recognized the necessity for preserving society's interest in the administration of criminal justice. Cases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests.

*Id.*

The "approach has thus been to identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial." *Id.* at 364-65 (citing *Black v. United States*, 385 U.S. 26 (1966), and *O'Brien v. United States,* 386 U.S. 345 (1967), remanding for new trials rather than dismissing indictments after law enforcement officers improperly overheard conversations between defendant and counsel). Accordingly, in *Morrison* the Supreme Court noted the defendant had demonstrated no prejudice, either transitory or permanent, and held that "absent demonstrable prejudice, or substantial threat thereof, dismissal of an indictment is plainly inappropriate, even though the violation may have been deliberate." *Id.* at 365-66.

The Eighth Circuit has applied this holding in *Singer*, as noted above. It also has cited *Morrison* in a case involving intercepted jail phone calls with attorneys. *See Clark v. Wood,* 823 F.2d 1241, 1249-50 (8th Cir. 1987) (denying habeas relief because defendant "failed to demonstrate that the substance of the overheard conversations were used against him").

Here, Lewis has not demonstrated "actual and substantial prejudice" or "a substantial threat" of prejudice to justify dismissing the indictment. Rather, after careful consideration of the entire record, the Court finds it appropriate to tailor the remedy to the injury suffered in accordance with *Morrison.*

It is clear that Det. Villegas engaged in a pattern of deliberate and egregious intrusion into Lewis's attorney-client relationship by reading Lewis's February 7 letter, forwarding it to the federal prosecutor, and listening to portions of phone calls with his attorney (about which she lied at the September 11 hearing). The fact that she only listened to portions of four of the attorney calls shown on the call log[15] does not negate her failure to have the phone number immediately blocked, much less her decision to instead keep listening in during the 6-month period from Nov. 12, 2018 to May 2, 2019. Even worse, she downloaded two calls, with talk durations of 1-and-a-half minutes and 3 minutes, 43 seconds, and there is no way to know from the call logs whether she listened to both recordings in their entirety.

Lewis makes a valid and important point that it is not known whether any privileged communications that Det. Villegas heard or read tainted her conversations with other law enforcement officers or potential trial witnesses. Her testimony deserves to be viewed with skepticism on matters that cannot be independently verified. But at the same time, there is no evidence in the record that her conversations with anyone involved in the case were contaminated by privileged information. Det. Villegas has been fixated on this case and on Lewis's personal relationships. Her fixation led her to drop off a personal letter between Lewis and a girlfriend, EG, at AA's hotel. AA, a prior grand jury witness, was then pregnant with Lewis's child. Det. Villegas impersonated Lewis's former girlfriend, LH, appropriating LH's email account and a Facebook page to tell AA that she (LH) and Lewis were reuniting. Her conduct went beyond a mere tawdry lack of professionalism. And the

---

[15] The Government points out that the call log shows she listened to 8 seconds, 5 seconds, 1 minute and 18 seconds, and 20 seconds of those four calls.

Anoka County Jail's casual approach to recognizing and securing legal mail, even after the violation involving Lewis's February 7 letter was brought to Lt. Larson's attention, does not inspire confidence that other violations have not occurred which simply have not come to light. Many questions remain unanswered by the record now before the Court, including the interplay or level of coordination between the state and federal investigators and prosecution teams. Such taint as is apparent from this record, however, does not appear to so infect the *federal* prosecution that dismissal of the indictment is warranted.

Based on the record before it, the Court finds that any prejudice from the Government's intrusion into his privileged communications can be remedied by limiting the Government's evidence as follows:

1.      Det. Villegas shall have no further involvement of any kind in the federal prosecution of Lewis;

2.      The Government shall not call AA, LH, or EG to testify at Lewis's trial;

3.      Pursuant to the Government's stipulation [Docket No. 100 at 6], the Government may only call the following persons to testify at Lewis's federal trial: Coon Rapids Police Officers Thomas Sharon, Phillip Wege, Stephen Beberg, and Anthony Newton; Loftus Center apartment building employees Michael Moriarty and Brian Prihoda; persons involved in collecting and analyzing DNA (subject to the Court's ruling on admissibility): Coon Rapids Det. Autumn Nelson, and Steve Banning (current employee) and Erin Moriarty (former employee) of the Midwest Regional Forensic Laboratory; ATFE Special Agent David Voth, who performed the interstate nexus examination of the firearm; and a fingerprint expert to the extent needed to testify to Lewis's status as a felon.

4.      The Government is instructed that, before it presents the testimony of any witness at trial, it must inquire whether that witness discussed with Det. Villegas the content of Lewis's February 7, 2019 letter to public defender Zunker. The Government is further directed to bring any such discussions of which it learns to the attention of opposing counsel and the Court.

## RECOMMENDATION

IT IS HEREBY RECOMMENDED that Defendant Kenneth Davon Lewis's Motion to Dismiss Indictment or, Alternatively, to Suppress Testimony [Docket No. 70] be GRANTED IN PART and DENIED IN PART as follows:

1.      the motion to dismiss the indictment be DENIED;

2.      the motion to suppress the testimony of Villegas be GRANTED and the Government be subject to the following limitations:

a.      Det. Villegas shall have no further involvement of any kind in the federal prosecution of Lewis;

b.      The Government shall not call AA, LH, or EG to testify at Lewis's trial;

c.      Pursuant to the Government's stipulation [Docket No. 100 at 6], the Government may only call the following persons to testify at Lewis's federal trial: Coon Rapids Police Officers Thomas Sharon, Phillip Wege, Stephen Beberg, and Anthony Newton; Loftus Center apartment building employees Michael Moriarty and Brian Prihoda; persons involved in collecting and analyzing DNA (subject to the Court's ruling on admissibility): Coon Rapids Det. Autumn Nelson, and Steve Banning (current employee) and Erin Moriarty (former employee) of the Midwest Regional Forensic Laboratory;

23

ATFE Special Agent David Voth, who performed the interstate nexus examination of the firearm; and a fingerprint expert to the extent needed to testify to Lewis's status as a felon; and

d.      The Government is instructed that, before it presents the testimony of any witness at trial, it must inquire whether that witness discussed with Det. Villegas the content of Lewis's February 7, 2019 letter to public defender Zunker. The Government is further directed to bring any such discussions of which it learns to the attention of opposing counsel and the Court.

Dated: December 16, 2019

s/David T. Schultz_____
DAVID T. SCHULTZ
United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).